IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ALBION INTERNATIONAL, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>AMERICAN INTERNATIONAL CHEMICAL, INC., a Massachusetts corporation, AMT LABS, INC., a Utah corporation, and GLOBAL CALCIUM PRIVATE LIMITED, an Indian private limited company,<br><br>                      Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No.  2:07-cv-0994 CW<br><br>Judge Clark Waddoups |

## INTRODUCTION

Before the court is Defendant AMT Labs, Inc.'s (AMT) motion for summary judgment. (Dkt. No. 275).   AMT argues that Plaintiff Albion International, Inc.'s (Albion) Lanham Act false advertising claim brought against AMT is barred by the doctrine of laches.  For the reasons stated below, the court hereby GRANTS AMT's motion for summary judgment.

## BACKGROUND

Albion filed suit in this court on December 21, 2007 claiming that AMT, and other Defendants, had violated the Lanham Act by falsely advertising that products they sold were "chelates."  The precise definition of what constitutes a chelate is in dispute in this case, but the parties agree that chelates are marketed as nutritional supplements that are designed to provided minerals in a form that can be more readily absorbed by the human body than minerals in their natural state.  *See* Mem. Opp. Mot. for Sum. J., xiv (Dkt. No. 300).  It is Albion's contention that products manufactured by AMT and marketed as "chelates" are not actually chelated.

In the early 1990s, several significant employees at Albion became aware that AMT was purporting to sell chelates, including Albion President DeWayne Ashmead (Ashmead). Albion's Resp. to Interrogs., Ex. 16, pp. 3-4 (Dkt. No. 285). By at least September 28, 1992, Albion was in possession of marketing materials that AMT had produced touting the nutritional benefits of AMT manufactured chelates. *See* Fax from Albion re: AMT Literature, Ex. 41 (Dkt. No. 285). In the fax cover sheet, an Albion employee raises questions about the rat studies referenced in the marketing materials. *See Id*. In August 1993, Robert Jeppsen (Jeppsen), an employee of Albion, attended a subcommittee meeting of the National Nutritional Foods Association (NNFA), where the definition of chelates was discussed. *See* Inter-Office Memorandum, August 13, 1993, Ex. 68 (Dkt. No. 284). The subcommittee meeting was attended by representatives of several of Albion's competitors that purported to sell chelates, including Dr. Sen-Maw Fang (Fang), the owner of AMT. *Id*.

In several instances, both before and after Albion discovered that AMT was purporting to sell chelates, Albion, through Ashmead or through official corporate publications, made statements in the market place that indicated that Albion was the only manufacturer of chelates that was marketing and selling authentic, nutritionally-valuable chelates for human consumption.

For example, in a 1989 book entitled <u>Conversations on Chelation and Mineral Nutrition</u>, Ashmead wrote the following about competitors of Albion that purported to sell chelates:

> I recall a research project in which the molecular weights of several chelates were measured. Every manufacturer except one had made chelates whose molecular weights were between 4,500 and 10,000. No one could make a smaller chelate because they would have infringed on the patent of the only company whose chelates had a molecular weight less than 1,000. In other words, to my knowledge only one company is building amino acid chelates that can be absorbed by the body intact. The other products, if they are chelates at all, must be digested in the stomach and intestines before they can be absorbed. When digestion occurs and

generally releases the minerals from the chelating agent, these free metal ions are no better absorbed than nonchelated minerals.

. . . .

Albion Laboratories is the only company in the industry with patents guaranteeing that, if the mineral is chelated, it will result in greater absorption of that mineral. If you look closely at labels, you will see that no other company even claims that its chelates are absorbed except Albion. These companies don't make these claims because of possible patent infringements or lack of research proof that their products are truly better than inorganic mineral salts.

Ex. 30, pp. 42-43 (Dkt. No. 285).

In July 1993, Albion published a newsletter entitled "Albion Human Nutrition: Research Notes," which made claims about Albion's competitors that were similar to those made in Ashmead's 1989 book. *See* Albion Research Notes, July 1993, Ex. 39, pp. 17-18 (Dkt. No. 285). In the newsletter, Albion claimed that:

A recent study conducted at a university in conjunction with a private laboratory tested several brands of so called amino acid chelates. It was determined that only one company was making a true, nutritionally functional chelate – and that company was Albion Laboratories. The rest of the products claiming to be chelates were found to be simple mixtures of proteins and mineral salts.

A nutritionally functional chelate must be strong enough to resist destruction in the gastrointestinal system, yet allow its mineral content to be released for use inside the body. At present, this unique type of chelate can only be prepared in one way, and that manufacturing method is patented by Albion. Unless the amino acid chelate is produced via the Albion method, it is probably of no more nutritional value than the other inorganic mineral/protein blends that have been passed off as chelates.

A nutritionally functional amino acid chelate must also have a molecular weight that is small enough to allow intact absorption through the intestinal wall. To do so, it must have a molecular weight of less than 1500 daltons. In laboratory tests, only one manufacturer – Albion Laboratories – was found to produce a

> mineral amino acid chelate weighing less than 1500 daltons. This small molecular weight chelate is described in the Albion patents. Any chelate weighing over 1500 daltons requires digestion of the chelate in order to be absorbed, and digestion will destroy that chelate.

*Id.*

In the July 1994 issue of Albion's "Research Notes" newsletter, Albion again made statements accusing its competitors that purported to sell chelates of misleading the public:

> Over the years, the term "metal amino acid chelate" has been used to describe a certain class of mineral compounds . . . . Based on pioneering research, Albion Laboratories developed mineral forms that mimicked chelates in food and was the first to introduce them to the natural food industry. . . .
>
> Subsequently, the use of the term "amino acid chelate" became widely abused. A few unscrupulous companies began to sell inorganic minerals that were dry blended with vegetable protein as if they were amino acid chelates. A true metal amino acid chelate must be formed in a liquid environment, because only in solution will the ingredients react and form the special claw-like chelate bonded structure. These dry-blended "chelates" are cheap because they do not have to be dried or the protein digested into amino acids, but they do not possess the advantages of true amino acid chelates.
>
> . . . .
>
> Now, thanks to a movement by the National Nutritional Foods Association (NNFA) for industry self-regulation, the issue surrounding the use of the term amino acid chelate is being given proper attention. Over the last year or so, members of special committees to the NNFA have been working to develop proper definitions to certify metal amino acid chelates, as well as other mineral forms. The NNFA is to be commended for its desire to address this issue and protect the public interest.

Albion Research Notes, July 1994, Ex. 39, p. 28 (Dkt. No. 285).

In a July 11, 1995 paper entitled "Proof of Chelation in Albion Laboratories, Inc.'s Amino Acid Chelates," in a section entitled "Proof of Chelation," Albion states that it is "the

only manufacturer that makes a pure and total amino acid chelates [sic]."  Proof of Chelation Article, Ex. 50, p. 11 (Dkt. No. 284).  It continues that an analysis of crystal structures grown from its zinc bisglycinate chelate has been analyzed by researchers at Brigham Young University (BYU).  *Id*. at 11-12.  Albion then asserts, "This is absolute proof that Albion produces a metal amino acid chelate."  *Id*. at 12.  Albion further summarizes additional studies done at BYU, the University of Utah, Utah State University, Weber State University, and Snow College, all of which Albion asserts, support its conclusions.  *Id*. at 12-17.  Albion states that it had "in its research files over 5,000 trials and studies that deal with Albion's metal-amino acid chelates."  *Id*. at 18.  The author continues, these "physiological response trials with Albion's products cannot be applied to a competitor's products because they do not have an Albion chelate."  *Id*.  Albion then made the following statement about its competitors: "They cannot prove chelation because they do not have a chelate.  If they did have a metal amino acid chelate, they would be infringing any one of Albion's 50+ patents and patents pending."  *Id*.  Albion concludes its research with a "Summary" stating, "No other company can offer the unequivocal proof of chelation through structural studies and physiological response that Albion can, because they simply do not have it."  *Id*. at 21.

In October 2001, Ashmead sent an email to an Albion customer, claiming that AMT products were "not true chelates, but admixtures."  Email from Ashmead to Oscar Pineda, Ex. 47 (Dkt. No. 284).  In the same email, Ashmead states that "[t]he past analysis that has been made of [AMT's] products indicated that no chelation reaction has occurred.  Instead [AMT's] products are simply mixtures of metal salts and protein."  *Id*.

In 2003, Albion was able to obtain a few samples of AMT's chelate products, which were tested to determine whether they were chelated.  Decl. of James C. Hyde ¶ 16 (Dkt. No. 301).

According to Albion, the tests showed that AMT's chelates were not chelated.  *Id*.  After obtaining this evidence, Albion filed its false advertising claim against AMT, which is the subject of the motion for summary judgment at issue.

## STANDARD OF REVIEW

"Summary judgment is proper if the evidence submitted by the parties, viewed in the light most favorable to the non-movant, indicates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Faustin v. City & County of Denver, Colo.*, 423 F.3d 1192, 1198 (10th Cir. 2005) (internal quotation marks and citations omitted).  *See also* Fed R. Civ. P. 56(c).  "A 'material fact' is one which could have an impact on the outcome of the lawsuit, while a 'genuine issue' of such a material fact exists if a rational jury could find in favor of the non-moving party based on the evidence presented."  *Chasteen v. UNISIA JECS Corp.*, 216 F.3d 1212, 1216 (10th Cir. 2000).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "nonmoving party must, at a minimum, direct the court to facts which establish a genuine issue for trial.  In the face of a properly supported motion for summary judgment, the nonmoving party may not rely upon unsupported allegations without 'any significant probative evidence tending to support the complaint.'"  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 259 (1986)).  *See also* Fed R. Civ. P. 56(e).  "To survive summary judgment, [a] nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not

sufficient." *Skrypcak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1244 (10th Cir. 2010) (citation omitted).

## ANALYSIS

To prove the affirmative defense of laches, a defendant must show that "there has been an unreasonable delay in asserting the claim, *and* that the defendant was materially prejudiced by the delay." *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1208 (10th Cir. 2001) (emphasis in original) (citation omitted).

## I.   UNREASONABLE DELAY

While the length of delay in asserting a claim has no fixed time limits in the context of laches, *see A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc), many courts have found it appropriate to refer to a state statute of limitation that is analogous to a plaintiff's claim to determine whether there has been unreasonable delay.  *See Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123, 135 (3d Cir. 2005) ("Courts commonly use the appropriate statute of limitations as a guideline in claims for false advertising under . . . the Lanham Act.").  Several circuit courts have gone as far as adopting a presumption that laches bars a claim if the claim is filed outside an analogous state statute of limitations.  *See Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006); *Santana Products, Inc.*, 401 F.3d at 138-39; *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 793 (7th Cir. 2002); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996); *A.C. Aukerman Co.*, 960 F.2d at 1034-35.  While the Tenth Circuit has not expressly adopted such a presumption, the court believes it would if faced with the issue directly.[1]  This court will apply

---

[1]  In *Lawson v. Haynes*, 170 F.2d 741, 744 (10th Cir. 1948), the Tenth Circuit stated that, in equitable cases, statutes of limitation are only relevant by analogy in the context of a laches defense.  *See also Pepper v. Truitt*, 158 F.2d 246, 250 (10th Cir. 1946).  The claims at issue in this case, however, are not equitable but instead have their source in federal statutory law.  The Supreme Court has made clear that where Congress has not

the presumption of laches in this case; however, the court finds that Albion's claim was unreasonably delayed regardless of whether such a presumption applies.

To apply the presumption of laches in this case, the court must first determine what is the analogous state statute of limitations.  Most courts that have addressed the issue have determined that for Lanham Act false advertising claims, the most analogous state statute of limitations is the one that is applied to fraud claims.  *See Conopco, Inc.*, 95 F.3d at 191-92 (affirming district court's reference to state statute of limitation for fraud in false advertising case); *Icon Health & Fitness, Inc. v. The Nautilus Group, Inc.*, No. 1:02CV00109TC, 2005 WL 3681813 at *5 (D. Utah. Oct. 24, 2005) (unpublished) (looking to statute of limitations for fraud claim when applying presumption of laches to Lanham Act false advertising claim).  Neither party disputes that Utah's statute of limitations for fraud claims should be referred to in this case.  Under Utah Code Ann. § 78B-2-305(3), the statute of limitations for claims brought on the grounds of fraud or mistake is three years from the "discovery by the aggrieved party of the facts constituting the fraud or mistake."  (2012).  The presumption of laches would apply to preclude Albion's false advertising claim, then, if AMT shows that the statute of limitations for fraud would have run had it been applied to the claim.

---

established a time limitation for a federal cause of action, courts should borrow statutes of limitations that would apply to analogous claims. *See Wilson v. Garcia*, 471 U.S. 261, 266 (1985) ("When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to do so."); *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991) ("[W]e may assume that, in enacting remedial legislation, Congress ordinarily intends by its silence that we borrow state law."). *See also Bowdry v. United Air Lines, Inc.*, 956 F.2d 999, 1004-1005 (10th Cir. 1992) ("[W]hen Congress does not specify a statute of limitations, the settled practice is to presume that Congress intended the courts to apply the most analogous state law statute of limitations.").  It is reasonable to assume that where, as in this case, a federal statute is silent with respect to a statute of limitations, the Tenth Circuit would be at least as likely to apply a presumption of laches based on an analogous state statute of limitations as it would be to borrow an analogous state statute of limitations to bar a suit as directed by the Supreme Court.  The court also notes that this district has applied a presumption of laches in the context of a false advertising claim in the past. *See Icon Health & Fitness, Inc. v. The Nautilus Group, Inc.*, No. 1:02CV00109TC, 2005 WL 3681813 at *5 (D. Utah. Oct. 24, 2005) (unpublished).

AMT argues that Albion became aware of its claim for false advertising as early as 1992, when Albion executives had possession of marketing materials promoting AMT's chelates. According to AMT, the relevant limitations period would have started running at that time, fifteen years before Albion filed its false advertising claim in this court.  Albion argues that the relevant limitations period should not start in 1992 because Albion was not aware that AMT was engaging in false advertising at that time.  Instead, Albion argues that the relevant limitations period did not begin until Albion was able to prove its claim against AMT.  According to Albion, laches should not bar the false advertising claim because Albion was not able to prove its claim until 2008, after the claim had been filed in the first instance.

When determining whether a plaintiff's claim is unreasonably delayed, the court looks to the time when the plaintiff gained "such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Hornady Mfg. Co. v. Double Tap Ammunition, Inc.*, 835 F.Supp.2d 1150, 1153 (D. Utah 2011) (quoting *Johnston v. Standard Min. Co.*, 148 U.S. 360, 370 (1893)). Albion's assertion that the period of limitations should not start to run until it can prove its claim does not have any basis in the law.  Albion cites *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569-70 (6th Cir. 2000) to support its characterization of the law.  *Kellogg Co.*, however, does not say that unreasonable delay should be measured from the time that a plaintiff can prove a claim. Instead, in *Kellogg Co.*, the Sixth Circuit stated that "any delay attributed to the plaintiff must be measured from the time at which the plaintiff *knew or should have known* that this infringement had ripened into a provable claim."  *Id.* (emphasis added).  This statement of the law is not significantly different than the one cited by *Hornady Mfg. Co.*  A plaintiff is, of course, not chargeable with knowledge of a claim that does not yet exist.  But when a plaintiff becomes

aware of facts that would lead to discovery of an existing claim upon reasonable investigation, the laches period begins. Plaintiff has a duty to engage in a reasonable investigation of claims he or she could have learned of with reasonable diligence. *Potash Co. of Am v. Int'l Minerals & Chem. Corp.*, 213 F.2d 153, 155 (10th Cir. 1954) ("[I]gnorance will not of itself excuse delay. The party must be diligent and make such inquiry and investigation as the circumstances reasonably suggest, and the means of knowledge are generally equivalent to actual knowledge.").

The court finds that Albion's delay in filing its false advertising claim against AMT exceeded the Utah statute of limitations for bringing fraud claims. As noted above, Albion began making claims in the marketplace about the propriety of its competitor's chelates as early as 1989. Albion became aware that AMT was a competitor marketing chelates by at least 1992. Both before and after Albion became aware of AMT's presence in the chelate market, Albion claimed that it was the only company that could manufacture true chelates that were nutritionally functional for humans. These claims were based on purported testing of competitor's chelates that revealed that Albion's competitors were selling "simple mixtures of proteins and mineral salts." *See* Albion Research Notes, July 1993, Ex. 39, pp. 17-18 (Dkt. No. 285). Albion also claimed in its marketing materials, that if any other manufacturer of chelates was selling true chelates, it would be violating Albion's patents. *See* Proof of Chelation Article, Ex. 50, p. 18 (Dkt. No. 285).

While Albion may not have made any express claims about the propriety of AMT's chelates before 2001, its broad claims about all competing chelate manufacturers is sufficient to have put Albion on notice that it may have a false advertising claim against AMT. These broad public claims are the same as the claims Albion made against AMT in its amended complaint. *See* Amended Complaint 5-9 (Dkt. No. 92). If Albion believed that all competing chelate

manufacturers in the market were falsely advertising their products as chelates, then surely it had knowledge of enough facts to conduct a reasonable investigation of AMT's chelates.

Even if AMT's broad statements about competing chelate manufacturers in general were insufficient to put Albion on notice of a potential claim against AMT, Albion was on actual notice of its claim against AMT by at least October 2001, when the President of Albion sent an email to a customer alleging that the products AMT was advertising as chelates were not true chelates. Albion argues that the court should disregard the 2001 email from Albion's President because it is contradicted by later testimony that no testing of AMT's products was done until 2003. *See* Mem. Opp. Sum. J. 10 (Dkt. No. 300). The period of time from which the court should consider whether Albion's claim was unreasonably delayed does not depend on when Albion tested AMT's products; it depends on when Albion knew or should have known of the claim it had against AMT. Albion is not permitted to make claims against AMT in the marketplace to deter potential customers of AMT from buying their products, and then later claim it was unaware whether the statements made about the propriety of AMT's chelates were true or not.

Whether the court determines that Albion was aware of its false advertising claim against AMT in the early 1990s, when Albion became aware of AMT's chelate products, or in 2001, when Albion's president made false advertising allegations against AMT to a customer, it is clear that Albion sat on its claim against AMT for a period that exceeds the three-year statute of limitations for fraud claims under Utah law. Therefore, the presumption of laches applies to support AMT's argument that Albion's delay was unreasonable.

Albion may rebut the presumption of laches by showing that the delay to file its claim was reasonable in light of the circumstances. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*

304 F.3d 829, 838 (9th Cir. 2002). Albion claims that its delay was reasonable because of AMT's secrecy with regards to its chelate products. According to Albion, it is very difficult to obtain testable samples of AMT's chelates because they are not available for sale to the general public, and because AMT's customers are unwilling to help Albion obtain them. *See* Decl. of James C. Hyde ¶¶ 4-13 (Dkt. No. 301). Albion's CEO has stated that the company has tried, unsuccessfully on most occasions, to obtain AMT samples since at least 1996. *Id*. at ¶ 11. Testable samples were not obtained, however, until 2003. *Id*. at ¶ 16. According to Albion's CEO, it was only after testing the samples obtained in 2003 that Albion had any evidence of the chemical nature of AMT's chelates. *Id*. at ¶ 23.

The only evidentiary support Albion has provided to show that it could not obtain testable samples of AMT products until 2003 is a declaration made by James Hyde, Albion's CEO. The conclusory and self-serving declaration of Albion's CEO is insufficient to create a factual dispute about the reasonableness of Albion's delay in bringing its false advertising claim against AMT. *See Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1095 n.2 (10th Cir. 2010) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)) ("[A] conclusory and self-serving affidavit is insufficient to create a factual dispute.") (internal quotation marks omitted). Because Albion has failed to properly support its assertion that it could not obtain testable samples of AMT chelates prior to 2003, the court cannot rely on the assertion to find that Albion's delay was reasonable. *See* Fed. R. Civ. P. 56(e).

Furthermore, even if the court recognized that the Hyde declaration created a dispute of fact with regard to whether Albion's delay was reasonable as a result of the inability to obtain samples by 2003, Albion has made no effort to justify the delay between the time it allegedly obtained testable AMT samples and the time that the false advertising claim was filed. The

delay between the time Albion obtained testable AMT chelates and the time the complaint was filed exceeded Utah's statute of limitations for fraud claims. If the presumption of laches is applied, Albion would have the burden of proving that this four-year delay was justified. They have not made any attempt to do so.

Albion also argues that its delay was justified because no validated testing methods had been developed to prove AMT's chelates were not chelated until 2004 or later. *See* Decl. of Stephen Ashmead ¶¶ 13-17 (Dkt. No. 301). According to Stephen Ashmead, who is Albion's Chief Science Officer, if Albion had brought its claims before its testing methods were validated, any claims premised on the testing would not have been well received in court. *Id*. at ¶ 12. For that reason, among others, Stephen Ashmead claims he recommended against litigation in 2003. *Id*. at ¶ 17.

As stated above, Albion cannot create a genuine issue of material fact by merely presenting the court with a conclusory, self-serving declaration. *See Valley Forge Ins. Co.*, 616 F.3d at 1095 n.2. The court must look at evidence outside Stephen Ashmead's declaration to determine whether there is a genuine issue of fact with regard to the reasonableness of Albion's delay because of its claim that it did not have a validated testing method to prove AMT's chelates were not chelated. The admissible evidence does not support Albion's conclusory assertions. In Albion's own documents discussing verification of chelation, it asserts a variety of tests, including studies from several university researchers, offer "unequivocable proof of chelation." Proof of Chelation Article, Ex. 50, p. 21 (Dkt. No. 285). Albion provides no explanation or support as to why these same confirming proofs could not be applied to AMT products.

In further support of its argument, Albion has provided the court with a 1997 article from the Association of American Feed Control Officials (AAFCO) lamenting the lack of "validated methods for determining chelate quality." *See* When is a Chelate not a Chelate?, Ex. 62, p. 1 (Dkt. No. 301). The very same article continues by suggesting "[c]riteria for [validated] test methods" and discussing "inspired work" at the referenced laboratories for "two methods which seem to meet the criteria outlined above." *Id*. at 3. The article includes the conclusion that in "assessing chelate quality, no single test is conclusive. To measure the quality of a chelate several tests (pieces of a jigsaw puzzle) need to be employed to give a clearer picture." *Id*. at 4. The article Albion relies upon does not support a factual conclusion that no testing was available, only that several methods must be employed to create a "clearer picture." Albion offers no explanation as to why these methods were not sufficient as a basis for it to assert its false advertising claim. Moreover, Albion offers no explanation as to why these methods were not employed to support its assertion that AMT products were not true chelates.[2] This evidence is not sufficient to create a material issue of fact that Albion's delay was reasonably justified.

Even if Albion's evidence were sufficient to create a genuine issue of fact, however, the possibility that Albion did not have a validated test that it could use to prove its false advertising claim is not material to the reasonableness inquiry in this case. Albion has maintained since the early 1990s, through statements of its executives and in marketing materials, that it can test its competitor's chelate products and show that they are not true chelates. In a 1996 response to the United States Patent and Trademark Office during a re-examination proceeding of one of Albion's patents, Albion stated that "[t]he bands that are formed as a result of the chelation

---

[2]   The real problem with bringing a claim at that time appears to have been the lack of a recognized industry standard defining a chelate. The article notes that at that time there were "24 different AAFCO approved definitions for chelated/complexed mineral products . . . with another five tentative definitions pending." When is a Chelate not a Chelate?, Ex. 62, p. 4 (Dkt. No. 301).

reaction can be identified by FTIR, EPT, or other analytical techniques to affirm that chelation process between the metal and amino acids has actually occurred."   Albion's Resp. under 37 CFR 1.550(b), Ex. 87, p.3 (Dkt. No. 285).  It is clear that Albion believed that its testing showed conclusively that its competitors did not sell chelated products, even though the methods had not yet been validated.  The fact that Albion did not have the best methods to prove its claims until the mid-2000s did not make it reasonable for Albion to sit on its rights to the detriment of its competitors.

Even if the court assumes that Albion did not have a viable claim until validated testing methods were available, the lack of validated testing methods was the result, at least in part, of Albion's failure to seek validation at an early date.  According to Stephen Ashmead, once Albion had tested the AMT chelate samples it had obtained in 2003, Albion contacted the AAFCO to get the testing method validated.  Decl. of Stephen Ashmead ¶ 14 (Dkt. No. 301).  ("In 2003, I was seeking information on how best to validate the testing used to prove that AMT's products were not chelated.").  The testing method Albion used to support its claims against AMT is a method that was developed by Albion in 1995.  *Id.* at ¶ 8.  Albion offers no explanation as to why it did not seek to have its testing method validated at an earlier time.  Albion's failure to seek validation of its testing methodology at an earlier date cannot be the basis for determining that its delay in bringing suit was reasonable in the context of laches.

## II.   PREJUDICE

The next step in determining whether the doctrine of laches should be applied to bar Albion's false advertising claim is to determine whether AMT has met its burden of showing that it has been materially prejudiced by Albion's delay in bringing suit.  *See Rodriguez-Aguirre*, 264 F.3d at 1208.  There are two types of prejudice that are typically recognized by courts as

justifying a laches defense: evidentiary and economic. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001); *A.C. Aukerman Co.*, 960 F.2d at 1033. Evidentiary prejudice results from things such as "lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." *Danjaq LLC*, 263 F.3d at 955. *See also Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1360 (Fed. Cir. 2008). Economic or "expectation" prejudice exists when a defendant can show that a plaintiff's delay caused the defendant to take actions or experience consequences that would not have otherwise occurred had there been no delay. *Id.* AMT contends that it has experienced both evidentiary and economic prejudice as a result of Albion's tardy claim.

### A.    Evidentiary Prejudice

AMT argues that Albion's delay has resulted in the loss of documents that would be vital to its false advertising defense, the loss of key witnesses, and the faded memory of other important witnesses. *See* AMT's Mem. Supp. Sum. J. 12 (Dkt. No. 282). According to AMT, this lost evidence would have been a key part of AMT's argument that Albion's definition of chelate is not an objective one accepted by the scientific community. *Id* at 13. Specifically, AMT argues that Albion's definition of chelate is derived from a definition adopted by the NNFA in the mid-1990s, and that key evidence about the process the NNFA went through to adopt that definition has been lost. *Id.*

Albion argues that the lost evidence that AMT has identified is not relevant to the suit, as the NNFA definition has no bearing on the merits of Albion's false advertising claim. Mem. Opp. Sum. J. 19 (Dkt. No. 300). According to Albion, it will prove that AMT's chelates are not true chelates because of their physical nature and not because AMT's chelates do not meet any particular definition accepted by the NNFA. *Id.*

While Albion is correct that evidentiary prejudice only exists if a defendant identifies lost evidence that would be relevant to one or more of issues in dispute, *see Vineberg v. Bissonnette*, 548 F.3d 50, 58 (1st Cir. 2008), Albion is not correct in its assertion that the process of adopting the NNFA definition of chelates is irrelevant to this action.   Albion's claim is that AMT's statement that its products are chelates is literally false.   To determine whether an advertising statement is literally false, it is relevant for courts to consider objective industry standards.   *See Ill. Bell Tel. Co. v. MCI Telecomm. Corp.*, No. 96 C 2378, 1996 WL 717466 (N.D. Ill. Dec. 9, 1996) (unpublished) ("In determining whether a claim is literally false, industry standards should be examined."); *Castrol Inc. v. Pennzoil Co.*, 799 F.Supp. 424, 436 (D. N.J. 1992) ("In order to determine whether a claim is literally false courts have looked to objective industry standards rather than subjective standards of the party making the comparison.").   *See also Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 172 (3d Cir. 2001) ("There are decisions that support UPMC's contention that industry standards are relevant in determining whether the use of the term 'access' was literally false.").

Although Albion may decide it is not necessary to rely on the NNFA definition of chelate to prove its claim, it must provide evidence that there is consensus within the industry and the scientific community as to what the definition of a chelate is.   At the same time, AMT has the right to offer evidence to rebut the objective definition that Albion proposes.   The process the NNFA engaged in when developing its definition of chelates is relevant to a determination of what the objective industry standard is to call a product a "chelate."   Evidence regarding the NNFA process may also be relevant to determining whether Albion exerted undue influence over the adoption of the NNFA definition of chelate, and whether that influence has impacted the definition of chelate in the industry and the broader scientific community.

Because evidence regarding the process the NNFA engaged in to determine the definition of chelate is relevant to Albion's claim, the court must determine whether Albion's delay in bringing its suit against AMT caused such evidence to be lost. The court determines that it did. Evidence provided by AMT, and unrebutted by Albion, shows that several documents that may have been relevant to the NNFA's adoption of the chelate definition have been destroyed as a result of time lapse. *See* Email of Daron Watts, July 20, 2011, Ex. 65 (Dkt. No. 285); Ltr. from Nicholas J. Licato to Ryan B. Bell, Ex. 90, p. 1 (Dkt. No. 284). Albion itself only retains documents for a maximum of five years and may have destroyed documents that are relevant to the adoption of the NNFA chelate definition. *See* Albion Records Retention Policy, Ex. 58 (Dkt. No. 285). Albion's delay in bringing its claims against AMT likely resulted in the destruction of several pieces of relevant evidence that could have aided AMT in its defense.

In addition to the destruction of documents, AMT also cites the deaths of two potential witnesses as evidence of evidentiary prejudice that resulted from Albion's delay. One of these witnesses was Dr. M.T. Fouad, a person that AMT alleges was a vocal opponent of the definition adopted by the NNFA, and the other witness was Oscar Pineda, the Albion customer that received DeWayne Ashmead's 2001 email accusing AMT of selling false chelates. The deaths of these potential witnesses are further evidence that Albion's delay prejudiced AMT.

## B.    Economic Prejudice

To show economic or "expectation" prejudice, AMT must show that, as a result of Albion's delayed action, it continued development of the good-will associated with its chelate products during the period of delay. *See Pro Football, Inc. v. Harjo*, 565 F.3d 880, 884 (D.C. Cir. 2009). In most circumstances, evidence of continued investment is sufficient to prove economic prejudice. *Id. Cf. Bridgestone/Firestone Research, Inc. v. Auto. Club De L'Quest De*

*La France*, 245 F.3d 1359, 1363 (Fed. Cir. 2001) ("Economic prejudice arises from investment in and development of the trademark, and the continued commercial use and economic promotion of a mark over a prolonged period adds weight to the evidence of prejudice.").

The evidence shows that, during the period of delay, AMT continued to invest in its chelate business. According to Layne Hadley, the President of AMT Labs, AMT's sale of chelate products increased 469% from 1996 to 2006. Decl. of Layne Hadley, Ex. 5, p. 5 (Dkt. No. 284). Although the amount of growth varied from year to year, average sales increased approximately 19% per year over the ten year period.[3] *Id*. The percentage of chelate sales of total revenue increased from 2% in 1996 to 9% in 2006. *Id*. at 4. During the years in between, the percentage of total revenue varied from 2% to 10%. *Id*. AMT has also provided evidence that it made substantial investments in capital equipment to aid the expansion of its chelate business between 1996 and 2007. *Id*. at 5-6; Decl. of Dr. Joanna Shepherd, Economic Impact Assessment, Ex. 6, p. 10 (Dkt. No. 284).

Albion does not dispute that AMT invested in its chelate business between 1996 and 2007. Instead, it argues that AMT has not shown economic prejudice because it has not shown that its investment is "because of and as a result of Albion's delay." Albion's Mem. Opp. Sum. J. 13 (citing *State Contracting & Eng'g v. Condotte Am.*, 346 F.3d 1057, 1066 (Fed. Cir. 2003) (Dkt. No. 300). Albion also argues that AMT has failed to show that it would be forced to abandon investment in its chelate products if Albion were to prevail in this suit. *Id.* at 12.

Albion is correct that to show economic prejudice AMT must show that it invested in its chelate business in reliance on Albion's failure to bring its false advertising claim at an earlier time. *See City of Sherrill, N.Y. v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 217 (2005) ("It is

---

[3] AMT provided the sales figures in dollar amounts. Because the evidence was filed under seal, the court has used the percentage of increase to demonstrate the economic impact without putting the confidential sales information in the public record.

well established that laches, a doctrine focused on one side's inaction and *the other's legitimate reliance*, may bar long-dormant claims for equitable relief.") (emphasis added); *Pro Football, Inc.*, 565 F.3d at 884 ("To be sure, a finding of prejudice requires at least some reliance on the absence of a lawsuit[.]").  *But see A.C. Aukerman Co.*, 960 F.2d at 1042 ("[R]eliance is not a requirement of laches but is essential to equitable estoppel.").   In the context of laches, however, a defendant must only show general reliance on a plaintiff's delay, and not specific reliance on a particular plaintiff's silence.  *See Pro Football, Inc.*, 565 F.3d at 884 ("[L]aches requires only general evidence of prejudice, which may arise from mere proof of continued investment in the late-attacked mark alone."); *Bridgestone/Firestone Research, Inc.*, 245 F.3d at 1363 ("When there has been an unreasonable period of delay by a plaintiff, economic prejudice to the defendant may ensue whether or not the plaintiff overtly lulled the defendant into believing that the plaintiff would not act, or whether or not the defendant believed that the plaintiff would have grounds for action.").[4]

Requiring only general reliance to prove economic prejudice advances the purpose for allowing laches as a defense.  Requiring proof of specific reliance on a plaintiff's delay in bringing suit would be an evidentiary burden on a defendant that would be difficult to overcome.  In many cases, a defendant may not be aware of potential liability at the time a plaintiff may become aware of a claim.  Furthermore, requiring proof of a nexus between a plaintiff's silence a

---

[4]   Albion relies on *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992) to support its argument that AMT is required to prove explicitly that a nexus exists between a planitiff's delay and a defendant's investment in building its business.  While *Hemstreet* does state that such proof of nexus is required to show economic prejudice, it does so by misstating the holding of *A.C. Aukerman Co.*, 960 F.2d at 1033.  *Aukerman* does not require such a nexus.  Indeed, *Aukerman* explicitly states that reliance is not a requirement of laches.  960 F.2d at 1042.  Moreover, *Hemstreet* is contradicted by the Federal Circuit in *Bridgestone/Firestone Research, Inc.*  In *Bridgestone/Firestone*, the Federal Circuit held that evidence of investment in and development of a trademark during the period of a plaintiff's delay in bringing suit was sufficient to prove economic prejudice for purposes of laches.  Because *Hemstead* is inconsistent with other precedent of the Federal Circuit, the court will rely instead on more recent precedent of the Federal Circuit and other federal circuits to define the standard for proving economic prejudice.

defendant's investment and development in the goodwill of its business would allow plaintiffs to sit on claims they were aware of for an extended period of time, as long as they kept their potential claim a secret from a defendant. If accepted, Albion's characterization of the law would defeat the purpose of the prejudice requirement of laches, which is to prevent plaintiffs from lulling defendants into believing they can safely invest without the threat of litigation that might undermine the goodwill they have developed in their business. *See Pro Football, Inc.*, 565 F.3d at 884.

Because AMT has shown that it relied generally on a litigation free environment when it invested in developing its laches product line, the court finds that allowing Albion's false advertising suit to go forward would result in economic prejudice to AMT. Moreover, AMT supports its reliance argument with the sworn statement of its president that, had AMT known of Albion's claims in 1996, it would not have invested to develop its chelate business and would have developed other business avenues. *See* Decl. of Layne Hadley, Ex. 5, p. 7 (Dkt. No. 284).

## III.    PUBLIC HEALTH AND SAFETY

Even though the court has determined that Albion's delay in bringing its false advertising claim was unreasonable and that it prejudiced AMT, the court must also consider Albion's third defense. When a false advertising claim implicates public health issues, courts may allow the claim to proceed even in the face of a valid laches defense. *See Conopco, Inc.*, 95 F.3d at 194 ("[P]ublic health and safety concerns may well overwhelm other considerations in the application of laches[.]"). Albion claims that because chelates are marketed as nutritional products for human consumption, its claim that AMT is falsely marketing its products as chelates when they are not true chelates raises serious public health and safety concerns that should preclude the application of laches in this case.

While the court recognizes the importance of ensuring that the public is protected from false descriptions of health and medical products that may cause people harm, the burden is on Albion to show that such a threat to public health exists in this case. *See Jarrow Formulas, Inc.*, 304 F.3d at 841 ("[I]n order to ensure that laches remains a viable defense to Lanham Act claims, the public's interest will trump laches only when the suit concerns allegations that the product is harmful or otherwise a threat to public safety and well being."). Albion has not shown that labeling AMT's products "chelates" poses a serious threat to public safety. *See Id.* (no public safety threat when product did not pose a threat to public health or safety if ineffective).

Albion argues that such a threat does exist because the European Food Safety Authority (EFSA) has issued negative opinions about the safety of chelates made from soy or rice derivatives. Albion's Mem. Opp. Sum. J. 22 (Dkt. No. 300.) The EFSA opinion, however, merely states that it did not have enough information to assess the safety of certain types of chelates. This is not evidence that AMT's chelates pose a threat to public health. Furthermore, while the EFSA might have implications regarding the contents of AMT's chelate products, it does not implicate any threat that might be posed by labeling the products "chelates."

Albion's reliance on the FDA's designation of products that contain soy as "major food allergen[s]" suffers from the same problem. While AMT's products may contain soy, and may pose a danger to people who are allergic to soy, it is not clear how AMT labeling its product a "chelate" would increase the danger posed by the soy in its products. Albion has provided no evidence to suggest that consumers of chelate products expect their chelates not to contain soy.

Because Albion has failed to provide the court with any evidence that allowing AMT to label its products "chelates" would create a threat to public safety, the court will not make an exception to the applicability of the laches doctrine in this case.

IV.    **UNCLEAN HANDS**

Albion's final argument against the applicability of the laches doctrine in this case is that AMT is not eligible for equitable relief as a result of its own unclean hands.  The doctrine of unclean hands is designed to "protect the court from granting relief to a [party] no better than the [party] he is suing." *Worthington v. Anderson*, 386 F.3d 1314, 1319 (10th Cir. 2004) (quoting 5 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 31:45, at 31-92.3 (4th ed. 2004)).  Applying the doctrine has the effect of "clos[ing] the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the conduct of the defendant." *Id*. (citation omitted).  The unclean hands doctrine, however, does not empower a court to deny relief for "any and all inequitable conduct." *Id*. at 1320.  The inequitable conduct must be related to the claim to which it is asserted as a defense. *See Id*.; *Jarrow Formulas, Inc.*, 304 F.3d at 841.

In the context of a laches defense, a court may indeed bar a defendant relief on the grounds of laches if the court finds that the defendant engaged in inequitable conduct related to a plaintiff's claim. *See Danjaq LLC*, 263 F.3d at 957 (laches defense is not available to deliberate copyright infringer); *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2000) ("[T]he appellees' intentional infringement is a dispositive, threshold inquiry that bars further consideration of the laches defense[.]").  When a plaintiff brings a false advertising claim under the Lanham Act, however, the plaintiff must show that a defendant did more than make the challenged claims knowing they were false to defeat a laches defense. *See Jarrow Formulas, Inc.*, 304 F.3d at 841-42.   "To conclude otherwise would be effectively to preclude the application of laches whenever a dispute of fact regarding the merits of a Lanham Act claim existed because . . . conceivably all suits involving Lanham Act claims could involve accusations

of fraudulent or deceptive conduct." *Id.* (quoting *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 826 (7th Cir. 1999)). To escape laches in a false advertising case, a plaintiff must convince the court that a defendant "acted with a fraudulent intent in making the challenged claims." *Id.* at 842. *See also A.C. Aukerman Co.*, 960 F.2d at 1033 ("A patentee may also defeat a laches defense if the infringer 'has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor.'").

Most of the conduct Albion refers to in support of its unclean hands arguments is the same alleged conduct that gives rise to Albion's false advertising claim. Albion cannot defeat Laches by merely proffering evidence that AMT engaged in false advertising. *See Jarrow Formulas, Inc.*, 304 F.3d at 841-42. It must show that AMT had a fraudulent intent when it made the challenged claims. Albion has failed to do so.

Albion first points to AMT's citation to rat studies that purportedly prove the effectiveness of AMT chelates. According to Albion, these rat studies were not conducted by AMT using AMT products, but were instead conducted by Dr. Fang before AMT was founded using Albion chelate products. *See* Albion's Mem. Opp. Sum. J. pp. cxxx – cxxxiv (Dkt. No. 300). According to Dr. Fang, the chelates used in the rat studies at issue were made by him using a technique similar to the one used to make Albion chelates. *See* Fang Dep., Ex. 1, 158:2- 160:5 (Dkt. No. 301).[5] Dr. Fang insists, however, that the chelates used in the study were not Albion chelates because Albion could not make chelates that included radioactive compounds. *Id.* at 160:22-25. Dr. Fang also stated in his deposition that at the time of the studies, the process used to produce chelates was well known and that his production of the chelates used in the

---

[5] The page numbers used for the deposition are those indicated on the mini version of the transcript. The page number on the full page version is different.

studies was based on his prior knowledge.  *Id*. at 161:10-23.  Albion does not contest that Dr.

Fang had prior knowledge of how to produce chelates when he conducted the study.

The statements that Albion points to show AMT's unclean hands with respect to the rat

studies state:

> In an *in vitro* experiment using everted rat small intestine, the
> solution containing AMT Zinc Chelate was absorbed *more than
> four times faster* than that containing the equivalent amount of zinc
> chloride—the inorganic salt.

> The superior quality of AMT Zinc Chelate was also demonstrated
> in an *in situ* experiment using anesthetized rats.  A section of ileum
> was ligated and cleansed before the placement of a radioactively
> tagged Zn preparation.  Subsequently, the radioactivity in the
> hepatic portal vein blood was monitored to assess the absorption
> rate of zinc.  Under this condition, AMT Zinc Chelate was found to
> be absorbed 2.2 times better than the corresponding preparation
> using zinc chloride.

AMT Marketing Materials, Ex. 54, p.26 (Dkt. No. 301) (emphasis in original).  While the

substantive differences between AMT Zinc Chelate and the chelate material used in the actual

studies cited by AMT in this material may create a question as to whether AMT's claim is a

misrepresentation or not, it is not, on its face, evidence that AMT had an intent to defraud its

customers by claiming that the studies showed that AMT Zinc Chelate is more effective than an

inorganic salt.  AMT argues its AMT Zinc Chelate was substantially the same as the product

used in the rat studies, and that the studies supported AMT's claim.  No evidence supports that

this claim was known by AMT to be false.  Albion has not shown that AMT had a fraudulent

intent when it made these statements.

Albion next claims that AMT has unclean hands because they sell products as chelates

that they admit are not "official" or "true" chelates.  This claim mirrors the arguments Albion

makes in its underlying false advertising claim.  Albion argues that because AMT had told some

of its customers that certain products labeled chelates do not meet the technical definition of a chelate, AMT is willfully making statements it knows are false.  *See* Albion's Mem. Opp. Sum. J. 3 (Dkt. No. 300).  Showing that AMT has willfully made false statements is not enough to show that AMT has unclean hands that are sufficient to overcome a laches defense.  Albion must show that AMT had the intent to commit fraud when it labeled these products chelates.  Albion has not presented evidence that AMT had fraudulent intent with regards to these products.  To the contrary, the evidence shows that AMT informed its customers that the products did not meet the technical definition of a chelate.  *See* Fax from Oliver Fang to Warren Chem, Ex. 56, p. 17 (Dkt. No. 301).  Because Albion has not shown that AMT had fraudulent intent when it labeled certain products chelates that did not meet the technical definition of a chelate, the court will not set aside AMT's laches defense on the basis of unclean hands.

Albion's remaining unclean hands claims suffer from the same problem.  While Albion has presented some evidence to support its claim that AMT made statements that were not entirely accurate, they have not offered any evidence that AMT had the intent of committing fraud when labeling its chelate products.  This conclusion is required particularly in light of the controversy over what correctly defines a "chelate."  Certainly, during the years at issue in this suit, there was sufficient disagreement in the industry to preclude a finding by a jury that AMT acted with the required fraudulent intent in the marketing statements it made.  Albion has not met the burden of showing that AMT has engaged in "particularly egregious conduct which would change the equities significantly in plaintiff's favor."  *A.C. Aukerman Co.*, 960 F.2d at 1033. Therefore, the court will not excuse Albion's unreasonable delay in bringing suit on the grounds that AMT has engaged in significant inequitable conduct that relates to Albion's claim.

## CONCLUSION

For the reasons stated above, the court hereby GRANTS Defendant AMT's motion for summary judgment on the grounds of laches (Dkt. No. 275).  Albion's Third Claim for Relief against AMT is hereby DISMISSED.

DATED this 30th day of August, 2012.

BY THE COURT:

Clark Waddoups
United States District Court Judge